**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT BAER, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SHIFT4 PAYMENTS, INC., JARED ISAACMAN, NANCY DISMAN, and BRADLEY HERRING, | |
| Defendants. | |

Plaintiff Robert Baer ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Shift4 Payments, Inc. ("Shift4" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Shift4 securities between

June 5, 2020 and April 18, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile point-of-sale ("POS") solutions.   Shift4 conducted its initial public offering ("IPO") and began operating as a publicly traded company on or about June 5, 2020.

3.      In Shift4's third quarter ("Q3") of 2022, the Company completed its so-called "mass strategic buyout program" as part of a purported strategic initiative to insource its sales distribution network.

4.      According to Shift4, because the Company is not a "member bank" as defined in certain payment network rules, the Company is not eligible for primary membership in certain payment networks and is therefore unable to directly access them.  Accordingly, Shift4's payment networks require the Company to be sponsored by a member bank as a service provider, which the Company has accomplished through a sponsorship agreement with its sponsor bank.  To cover overdraft obligations at the sponsor bank, prior to December 2022, Shift4 had funds deposited in a sponsor bank merchant settlement account to facilitate gross card transaction deposits for those customers the Company bills on a monthly, as opposed to a daily, basis.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Shift4 had inadequate disclosure controls and procedures and internal control over financial reporting; (ii) as

a result, Shift4 failed to properly account for customer acquisition costs, thereby artificially inflating its net cash provided by operating activities; (iii) accordingly, Shift4 would likely be forced to restate one or more of its previously issued financial statements; (iv) Shift4 employed accounting maneuvers in connection with, among other things, its mass strategic buyout program and sponsor bank merchant settlement account, that were designed to present an inaccurate picture of, *inter alia*, the Company's performance, its underlying business quality, and its earnings power; (v) all the foregoing, once revealed, was likely to negatively impact Shift4's reputation and business; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On October 21, 2022, Shift4 disclosed in an SEC filing that the Company's Q3 2021, full year ("FY") 2021, first quarter ("Q1") 2022, and second quarter ("Q2") 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's financial controls, which had caused it to incorrectly treat "customer acquisition costs" as cash used in investing activities rather than cash used in operating activities in its Consolidated Statements of Cash Flows.

7.      On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022.

8.      On November 8, 2022, Shift4 filed restated financial statements with the SEC to properly account for its historical customer acquisition costs.  As a result of the restatements, Shift4 negatively revised its net cash provided by operating activities to $8 million (down from its originally reported $26.7 million), $4 million (down from its originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million) for the years ended December 31, 2019, 2020, and 2021, respectively; negatively revised its net cash used in operating activities to

$7.1 million (up from its originally reported $1.7 million) and net cash provided by operating activities to $30.8 million (down from its originally reported $37.1 million) for the three months ended March 31, 2021 and 2022, respectively; negatively revised its originally reported $5 million of net cash ***provided by*** operating activities to $7.7 million of net cash ***used in*** operating activities for the six months ended June 30, 2021, as well as negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million) for the six months ended June 30, 2022; and negatively revised its net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million) for the nine months ended September 30, 2021.

9.      On April 19, 2023, Blue Orca Capital published a report addressing Shift4 (the "Blue Orca Report"). The Blue Orca Report alleged, among other things, that "Shift4 [is], in reality, a roll-up of low-tech POS systems and payment processors which is substantially less profitable, generates far less cash, and is materially more levered than investors are led to believe." The Blue Orca Report further alleged that in 2022, "Shift4 engaged in a string of highly questionable and hyper-aggressive accounting maneuvers seemingly designed to keep the stock afloat, from cash flow manipulation to inexplicable distributor acquisitions that enabled it to capitalize a major component of COGS [cost of goods sold]." For example, the Blue Orca Report alleged, *inter alia*, that Shift4's "buyout of 50% of its independent distributors"—*i.e.*, in connection with its mass strategic buyout program—"and Q4 2022 cash account withdrawal" from its sponsor bank merchant settlement account "together inflated operating cash flow by 61%."

10.      On this news, Shift4's stock price fell $5.95 per share, or 8.68%, to close at $62.59 per share on April 19, 2023.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Shift4 is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Shift4 securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Shift4 is a Delaware corporation with principal executive offices located at 2202 N. Irving Street, Allentown, Pennsylvania 18109.  Shift4's Class A common stock trades

in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FOUR".

18.     Defendant Jared Isaacman ("Isaacman") has served as Shift4's Chief Executive Officer at all relevant times.

19.     Defendant Nancy Disman ("Disman") has served as Shift4's Chief Financial Officer ("CFO") since August 5, 2022.

20.     Defendant Bradley Herring ("Herring") served as Shift4's CFO from before the start of the Class Period to August 5, 2022.

21.     Defendants Isaacman, Disman, and Herring are sometimes referred to herein collectively as the "Individual Defendants".

22.     The Individual Defendants possessed the power and authority to control the contents of Shift4's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Shift4's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Shift4, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

23.     Shift4 and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile POS solutions; a mobile ordering, countertop POS, and self-service kiosk services; a cloud-based business intelligence tool that includes customer engagement, social media management, online reputation management, scheduling, and product pricing, as well as reporting and analytics; SkyTab POS, a POS workstation pre-loaded with software suites and integrated payment functionality; and SkyTab Mobile, a mobile payment solution.

25.     On May 15, 2020, Shift4 filed a registration statement on Form S-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on June 4, 2020 (the "Registration Statement").

26.     On or about June 5, 2020, Shift4 conducted its IPO and its Class A common stock began publicly trading on the NYSE.

27.     In Shift4's Q3 2022, the Company completed its so-called "mass strategic buyout program" as part of a purported strategic initiative to insource its sales distribution network.

28.     According to Shift4, because the Company is not a "member bank" as defined in certain payment network rules, the Company is not eligible for primary membership in certain payment networks and is therefore unable to directly access them.  Accordingly, Shift4's payment networks require the Company to be sponsored by a member bank as a service provider, which the Company has accomplished through a sponsorship agreement with its sponsor bank.  To cover overdraft obligations at the sponsor bank, prior to December 2022, Shift4 had funds deposited in

a sponsor bank merchant settlement account to facilitate gross card transaction deposits for those customers the Company bills on a monthly, as opposed to a daily, basis.

**Materially False and Misleading Statements Issued During the Class Period**

29.     The Class Period begins on June 5, 2020, when Shift4's Class A common stock began publicly trading on the NYSE pursuant to the Registration Statement.  The Registration Statement contained purported historical financial results of the Company, recording, *inter alia*, $18.7 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.

30.     On August 12, 2020, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2020 (the "Q2 2020 10-Q").  The Q2 2020 10-Q represented, in relevant part, "that, as of June 30, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

31.     Appended as exhibits to the Q2 2020 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Isaacman and Herring certified that "[t]he [Q2 2020 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2020 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

32.     On November 5, 2020, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q").  The Q3 2020 10-Q represented, in relevant part, "that, as of September 30, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

33.     Appended as exhibits to the Q3 2020 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

34.     On March 8, 2021, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K reiterated certain of the Company's purported historical financial results as originally reported in the Registration Statement, again recording $18.7 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.

35.     The 2020 10-K also recorded $19.4 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $23.4 million in net cash provided by operating activities, for the year ended December 31, 2020.

36.     In addition, the 2020 10-K represented "that, as of December 31, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

37.     Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

38.     On May 7, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2021 (the "Q1 2021 10-Q").  The Q1 2021 10-Q recorded $5.4 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $1.7 million in net cash used in operating activities, for the three months ended March 31, 2021.

39.     In addition, the Q1 2021 10-Q represented "that, as of March 31, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

40.     Appended as exhibits to the Q1 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

41.     On August 6, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2021 (the "Q2 2021 10-Q").  The Q2 2021 10-Q recorded $12.7 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $5 million in net cash provided by operating activities, for the six months ended June 30, 2021.

42.     In addition, the Q2 2021 10-Q represented "that, as of June 30, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

43.     Appended as exhibits to the Q2 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

44.     On November 10, 2021, Shift4 issued a shareholder letter announcing the Company's Q3 2021 financial results.  In the shareholder letter, the Company recorded $19.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.

45.     On November 12, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2021 (the "Q3 2021 10-Q").  The Q3 2021 10-Q recorded $19.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of

Cash Flows, as well as $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.

46.    In addition, the Q3 2021 10-Q represented "that, as of September 30, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

47.    Appended as exhibits to the Q3 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

48.    On March 1, 2022, Shift4 issued a shareholder letter announcing the Company's fourth quarter ("Q4") and FY 2021 financial results.  In the shareholder letter, the Company recorded $26.2 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.

49.    Also on March 1, 2022, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").  The 2021 10-K recorded $26.2 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.

50.    In addition, the 2021 10-K represented "that, as of December 31, 2021, our disclosure controls and procedures were effective at the reasonable assurance level" and "that as of December 31, 2021, the Company's internal control over financial reporting was effective."

51.    Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

52.    On May 5, 2022, Shift4 issued a shareholder letter announcing the Company's Q1 2022 financial results.  In the shareholder letter, the Company recorded $6.3 million of customer

acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.

53.     On May 6, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2022 (the "Q1 2022 10-Q").  The Q1 2022 10-Q recorded $6.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.

54.     In addition, the Q1 2022 10-Q represented "that, as of March 31, 2022, our disclosure controls and procedures were effective at the reasonable assurance level."

55.     Appended as exhibits to the Q1 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

56.     On August 4, 2022, Shift4 issued a shareholder letter announcing the Company's Q2 2022 financial results.  In the shareholder letter, the Company recorded $14.2 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.

57.     On August 5, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the "Q2 2022 10-Q").  The Q2 2022 10-Q recorded $14.2 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as

well as $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.

58.     In addition, the Q2 2022 10-Q represented "that, as of June 30, 2022, our disclosure controls and procedures were effective at the reasonable assurance level."

59.     Appended as exhibits to the Q2 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Herring.

60.     The statements referenced in ¶¶ 29-59 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Shift4 had inadequate disclosure controls and procedures and internal control over financial reporting; (ii) as a result, Shift4 failed to properly account for customer acquisition costs, thereby artificially inflating its net cash provided by operating activities; (iii) accordingly, Shift4 would likely be forced to restate one or more of its previously issued financial statements; (iv) all the foregoing, once revealed, was likely to negatively impact Shift4's reputation and business; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

61.     On October 21, 2022, after markets closed, Shift4 filed a current report on Form 8-K with the SEC, disclosing that the Company's Q3 2021, FY 2021, Q1 2022, and Q2 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's financial controls, which had caused it to incorrectly treat "customer acquisition costs" as cash used in investing activities rather than cash used in operating

activities in its Consolidated Statements of Cash Flows.  Specifically, the Form 8-K stated, in

relevant part:

> On October 17, 2022, the Audit Committee ("Audit Committee") of the Board of Directors of Shift4 Payments, Inc. (the "Company"), after discussion with management, concluded that the Company's (i) previously filed Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and (ii) previously filed Quarterly Reports on Form 10-Qs for each of the quarterly periods ended September 30, 2021, March 31, 2022 and June 30, 2022 (collectively the "Prior Financial Statements"), and any reports, related earnings releases, investor presentations or similar communications of the Company's Prior Financial Statements should no longer be relied upon.
>
> The determination resulted from an error in the Prior Financial Statements identified by the Company related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that "customer acquisition costs" should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements.
>
> * * *
>
> The Company intends to restate the Prior Financial Statements on or about November 9, 2022, at the time of the intended filing of its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022. In connection with such restatement, the Company has concluded that there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective.

62.     On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16

per share on October 24, 2022.  Despite this decline in the Company's stock price, Shift4 securities

continued trading at artificially inflated prices throughout the remainder of the Class Period

because of Defendants' misstatements and omissions regarding Shift4's employment of

accounting that was designed to present an inaccurate picture of the Company's true performance,

underlying business quality, and earnings power.

63.     For example, on November 7, 2022, Shift4 issued a shareholder letter announcing

the Company's Q3 2022 financial results (the "Q3 2022 Shareholder Letter").  In the Q3 2022

Shareholder Letter, Defendant Isaacman stated, in relevant part:

> I attribute our performance this quarter to well-executed organic initiatives, like
> SkyTab POS and our gateway sunset program, as well as disciplined investments
> in new verticals that moderate the typical seasonality that would have been
> expected in our high growth core. We continue to deliver on the expectations
> established during our 2021 Investor Day and as a result we are raising 2022
> volume, Gross Revenue less Network Fees, Adjusted EBITDA, Adjusted FCF
> outlook and reaffirming our mid-term outlook.

64.     In addition, the Q3 2022 Shareholder Letter indicated that Shift4 was executing on

its purported growth strategy by, *inter alia*, "[p]ursu[ing] strategic acquisitions[.]"  As a result, the

Q3 2022 Shareholder Letter touted that the Company had "[i]n-sourced distribution in key

markets, closed on and announced acquisitions to expand internationally and added key

capabilities and presence within the non-profit vertical[.]"

65.     On November 8, 2022, Shift4 filed an amendment to its 2021 10-K on Form 10-

K/A (the "2021 10-K/A"), an amendment to its Q1 2022 10-Q on Form 10-Q/A (the "Q1 2022 10-

Q/A"), and an amendment to its Q2 2022 10-Q on Form 10-Q/A (the "Q2 2022 10-Q/A") with the

SEC to properly account for customer acquisition costs in the Company's historical financial

statements.  The 2021 10-K/A negatively revised Shift4's net cash provided by operating activities

to $8 million (down from its originally reported $26.7 million), $4 million (down from its

originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million)

for the years ended December 31, 2019, 2020, and 2021, respectively.  The Q1 2022 10-Q/A

negatively revised Shift4's net cash used in operating activities to $7.1 million (up from its

originally reported $1.7 million) and net cash provided by operating activities to $30.8 million

(down from its originally reported $37.1 million) for the three months ended March 31, 2021 and

2022, respectively.  The Q2 2022 10-Q/A negatively revised Shift4's originally reported $5 million of net cash ***provided by*** operating activities to $7.7 million of net cash ***used in*** operating activities for the six months ended June 30, 2021, as well as negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million) for the six months ended June 30, 2022.

66.     Also on November 8, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2022 (the "Q3 2022 10-Q").  The Q3 2022 10-Q also contained revisions to Shift4's historical financial statements to properly account for customer acquisition costs, negatively revising the Company's net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million) for the nine months ended September 30, 2021.

67.     With respect to Shift4's distribution insourcing and residual commission buyouts in the quarter, the Q3 2022 10-Q stated, *inter alia*:

> During the three and nine months ended September 30, 2022, we completed $298.8 million and $311.7 million, respectively, of residual commission buyouts with certain third-party distribution partners, pursuant to which we acquired their ongoing merchant relationships that subscribe to our end-to-end payments platform. These amounts include $298.5 million in residual commission buyouts executed under our mass strategic buyout program completed in the three months ended September 30, 2022 in support of our strategic initiative to insource our sales distribution network.

68.     Appended as exhibits to the Q3 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Disman.

69.     On February 28, 2023, Shift4 issued a shareholder letter announcing the Company's Q4 and FY 2022 financial results (the "Q4/FY 2022 Shareholder Letter").  In the Q4/FY 2022 Shareholder Letter, Defendant Isaacman stated, in relevant part:

[W]e completed another reasonably strong quarter and closed out the year above our initial 2022 guidance, which we raised during the year. In addition to the following results, we recognized gross profit of $441.8 million in 2022, up from gross profit of $256.6 million in 2021, and net income of $86.7 million in 2022, up from net loss of ($74.0) million in 2021.

* * *

Aside from the advantages we possess within our 'High Growth Core', I believe our outperformance can be attributed to a disciplined focus on true 'needle moving' initiatives like our gateway sunset program, the release of our new restaurant POS product 'SkyTab', and the associated insourcing of our go-to-market distribution. Additionally, our well-timed investments in late 2021 have begun delivering considerable volume across our new verticals, such as Sports & Entertainment, Gaming, Sexy Tech, Non-Profits, International and from strategic enterprise relationships. These important investments and initiatives are proving to be timely and prescient.

In addition to the KPI's [key performance indicators] above, we also dramatically improved the margin and free cash flow profile of the business. However, unlike many of our competitors, we didn't achieve this through layoffs or divesting underperforming acquisitions. We invested in headcount, released new products and further monetized assets unique to Shift4. We ended the year with a strong balance sheet, which we view as fully affording us the flexibility to continue investing organically and inorganically.

70.     In addition, in a footnote accompanying Shift4's reconciliation of operating cash flow to free cash flow and adjusted free cash flow for 4Q 2022, the Q4/FY 2022 Shareholder Letter noted, in relevant part, that "[i]n December 2022, the Company received all funds held in its sponsor bank merchant settlement account that were previously deposited to cover the overdraft at the sponsor bank", and that, "[a]lthough the Company expects to finalize an agreement with the sponsor bank in the near term to not be required to deposit funds in the future, the Company has not yet reached an agreement."

71.     On March 31, 2023, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December

31, 2022 (the "2022 10-K").  With respect to Shift4's distribution insourcing and residual commission buyouts for the year, the 20222 10-K stated, *inter alia*:

> During the year ended December 31, 2022, we completed $318.9 million of residual commission buyouts with certain third-party distribution partners, pursuant to which we acquired their ongoing merchant relationships that subscribe to our end-to-end payments platform. These amounts include $305.4 million in residual commission buyouts executed under our strategic buyout program in support of our strategic initiative to insource our sales distribution network.

72.    In addition, with respect to Shift4's receipt and subsequent re-depositing of funds held in its sponsor bank merchant settlement account, the 2022 10-K stated, in relevant part:

> As of December 31, 2021, the Company had $53.3 million in funds deposited at the sponsor bank included within "Accounts Receivable" on its Consolidated Balance Sheets. In December 2022, the Company received all funds held in this account that were previously deposited to cover the overdraft at the sponsor bank. Although the Company expects to finalize an agreement with the sponsor bank in the near term to not be required to deposit funds in the future, the Company has not yet reached an agreement. As such, in January 2023, the Company deposited $33 million to its sponsor bank merchant settlement account to cover the overdraft as of December 31, 2022. The Company will continue to maintain a deposit with the sponsor bank to cover overdrafts until an amendment is finalized.

73.    Appended as exhibits to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Isaacman and Disman.

74.    The statements referenced in ¶¶ 63-64 and 67-73 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Shift4 employed accounting maneuvers in connection with, among other things, its mass strategic buyout program and sponsor bank merchant settlement account, that were designed to present an inaccurate picture of, *inter alia*, the Company's performance, its underlying business quality, and its earnings power; (ii) the foregoing, once revealed, was likely to negatively

impact Shift4's reputation and business; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

75.     On April 19, 2023, Blue Orca Capital published a report addressing Shift4.  The Blue Orca Report alleged, among other things, that "Shift4 [is], in reality, a roll-up of low-tech POS systems and payment processors which is substantially less profitable, generates far less cash, and is materially more levered than investors are led to believe."  The Blue Orca Report further alleged that in 2022, "Shift4 engaged in a string of highly questionable and hyper-aggressive accounting maneuvers seemingly designed to keep the stock afloat, from cash flow manipulation to inexplicable distributor acquisitions that enabled it to capitalize a major component of COGS."

76.     For example, the Blue Orca Report stated, *inter alia*:

> We estimate that, in total, Shift4's aggressive accounting games and M&A [merger and acquisition] activity inflated 2022 gross profit by 13%, Adj. EBITDA by 34%, and operating income by close to 3x, while its buyout of 50% of its independent distributors and Q4 2022 cash account withdrawal together inflated operating cash flow by 61%. We believe that, as a result, Shift4's true leverage stands at 5.3x Net Debt / Adj. EBITDA, far higher than reported by the Company. **Ultimately, we believe that Shift4's aggressive financial maneuvers mask a company that is far less profitable and less cash generative, and far more levered, than investors are led to believe.**

(Emphasis in original.)

77.     With respect to how Shift4 manipulated its financial results through its acquisition of its independent distributors in Q3 2023, the Blue Orca Report stated, *inter alia*:

> In Q3 FY22, Shift4 took the unusual step of acquiring distributors representing roughly 50% of its independent sales force, after having employed third-party resellers almost exclusively throughout its existence to that point. These distributors are responsible not only for marketing Shift4's products and services, but for managing the relationship between Shift4 and merchants over the life of each deal, for which they receive a "residual commission." As a consequence, costs associated with distribution that might have otherwise been allocated to SG&A [selling, general, and administrative expenses] are instead run through Shift4's

income statement via COGS, as its independent sales force is paid primarily through commissions which are expensed as a cost of goods sold.

**By buying out its distributors, Shift4 effectively moves costs from its income statement into cash flow from investing, flattering gross profit and EBITDA by paying acquired resellers a sum of cash up front equal to their outstanding commission balances.** In our view, this is a back-handed way of capitalizing COGS, giving the appearance of stronger gross profit and EBITDA without improving the underlying economics or earnings power of the business whatsoever.

Critically, while the sell-side has some awareness of the directional impact of the accounting around these deals on earnings, we believe that both analysts and the investing public are ignorant of the relative magnitude of residual commissions as a share of COGS – and, consequently, of the dramatic effect of Shift4's distributor acquisitions on Company financials. Shift4 has been coy about the weight of these costs, and has not, to our knowledge, openly quantified them when asked about the financial implications of its distributor acquisitions.[]

However, buried in a letter from Shift4 to the SEC regarding its accounting practices, we observe that residual commissions have accounted for a massive 40-45% of non-network fee COGS each year since FY19 ($115M in FY21). Removing this cost of sales from the income statement in its entirety would have permitted Shift4 to report an Adj. EBITDA by 60-70% between FY19-21.

\* \* \*

**Thus, by bringing ~50% of its independent resellers in-house, we estimate that Shift4 eliminates ~20-25% of its non-network fee COGS, immediately increasing its pro-forma Adj. EBIDTA on paper by 30-35% without, in our view, changing the underlying quality or earnings power of the business in any way.**

(Emphases in original.)

78.     With additional respect to how these acquisitions created an unduly rosy view of

Shift4's performance and ability to increase its gross profits, adjusted EBITDA, operating income,

and cash flow in Q4 and FY 2022, the Blue Orca Report stated, *inter alia*:

The financial impact of Shift4's actions took full effect in Q4 2022, the first quarter during which the acquired resellers were fully integrated into the Company. Shift4 reported non-network fee COGS of $61.1 million, inclusive of depreciation of equipment under lease, in Q4 2022. We estimate that, by acquiring distributors and wiping out ~23% of COGS (excluding network fees), Shift4 eliminated $18.3

million of residual commissions from its income statement, flattering gross profit (using its new methodology) by 15% and Adj. EBITDA by 24%.

\* \* \*

Critically, sell-side consensus around Shift4's Q4 Adj. EBITDA was $81.9 million going into earnings. **We estimate that, by removing $18.3 million of COGS from the income statement, Shift4 turned what would have been a $5.8 million Adj. EBITDA miss into a significant $12.5 million Adj. EBITDA beat.** And, given the public's ignorance of the magnitude of residual commissions removed via the distributor acquisitions, we don't think that the impact of these accounting machinations was accounted for by analysts in their pre-earnings estimates.

(Emphasis in original.)

79.     With respect to how Shift4 used its receipt and subsequent re-depositing of funds held in its sponsor bank merchant settlement account to give the appearance that the Company was more cash-flow-generative than it appeared to be, the Blue Orca Report stated, *inter alia*:

Shift4 reported surprisingly high operating cash flows of $139.5 million in Q4, blowing its previous quarterly high of $65.1 million in Q3 2022 out of the water. On paper, this lent credence to Shift4's narrative that the Company is becoming stronger and more cash-generative. It also came at the perfect time for the CEO, who quietly began his month-long divestment of up to 2 million shares tied to his first VPF contract immediately after Q4 earnings.

Yet dig deeper and this supposedly impressive result on cash flows appears entirely manufactured, in our opinion, using gimmicky cash movements around quarter-end.

Because Shift4 does not qualify as a member bank among major credit card issuers, it must use a sponsor bank to access these payment networks. But, as it bills some of its customers on a monthly rather than daily basis, it must maintain a deposit at its sponsor bank to cover potential overdrafts. This deposit stood at $76.5 million towards the end of Q4.

Sometime before the end of Q4 2022, Shift4 withdrew its entire deposit, claiming to be in negotiations for lower collateral requirements with its sponsor bank. Slipped into its Q4 shareholder letter was an ambiguous note to its cash flow statement stating that "In December 2022, the Company received all funds held in its sponsor bank merchant settlement account that were previously deposited to cover the overdraft at the sponsor bank," and that it "expects to finalize an agreement…to not be required to deposit funds in the future…."

* * *

In short, Shift4, under the guise of lobbying its sponsor bank for a new deal that excuses it from maintaining deposits, **pocketed its old deposit of $76.5 million and reported it as an addition to operating cash flow.**

Yet this maneuver appears, in our opinion, to be pure financial gimmickry. The very next month after recalling its deposit (and recognizing it as an addition to its now-juiced operating cash flow), **Shift4 appears to have returned a substantial chunk of the deposit just after the end of the fiscal year.**

In Shift4's 10-K, issued the morning after earnings (on which shares of FOUR rose more than 10% with the seemingly positive results), the Company admitted that, subsequent to the quarter's December 31 closing date, it re-deposited a substantial portion of the withdrawn cash (this time $33 million) into its sponsor bank to cover potential overdrafts.

* * *

**Simply by delaying the return of its deposit until January 2023, after the books for Q4 2022 were closed, Shift4 was able to report the full December withdrawal of $76.5 million as a windfall to operating cash flow.** Had it simply reduced the value of its deposit before quarter-close, the windfall would have been far smaller. But by withdrawing the full deposit, then placing a new, smaller deposit at its sponsor bank, it was able to post a massive $76.5 million gain to operating cash flow.

This gimmickry has an outsized impact on reported cash flow. **<u>By shifting around money across its various bank accounts, we calculate that Shift4 was able to turn what would have been an operating cash flow contraction into a Q-o-Q doubling of operating cash flow, and to post its highest quarterly operating cash flow figure to date.</u>**

(Emphases in original.)

80.     On this news, Shift4's stock price fell $5.95 per share, or 8.68%, to close at $62.59 per share on April 19, 2023.

81.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

82.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Shift4 securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

83.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Shift4 securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Shift4 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Shift4;

- whether the Individual Defendants caused Shift4 to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Shift4 securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

88.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Shift4 securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Shift4 securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

89.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

90.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

91.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

92.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

93.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Shift4 securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Shift4 securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

94.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Shift4 securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Shift4's finances and business prospects.

95.     By virtue of their positions at Shift4, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

96.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Shift4, the Individual Defendants had knowledge of the details of Shift4's internal affairs.

97.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Shift4.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Shift4's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Shift4 securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Shift4's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Shift4 securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

98.     During the Class Period, Shift4 securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Shift4 securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were

paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Shift4 securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Shift4 securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

99.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

101.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102.     During the Class Period, the Individual Defendants participated in the operation and management of Shift4, and conducted and participated, directly and indirectly, in the conduct of Shift4's business affairs.  Because of their senior positions, they knew the adverse non-public information about Shift4's misstatement of income and expenses and false financial statements.

103.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Shift4's

financial condition and results of operations, and to correct promptly any public statements issued by Shift4 which had become materially false or misleading.

104.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Shift4 disseminated in the marketplace during the Class Period concerning Shift4's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Shift4 to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Shift4 within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Shift4 securities.

105.    Each of the Individual Defendants, therefore, acted as a controlling person of Shift4.  By reason of their senior management positions and/or being directors of Shift4, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Shift4 to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Shift4 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

106.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Shift4.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  October 13, 2023                        Respectfully submitted,

**POMERANTZ LLP**

*s/ Emily C. Finestone*
Emily C. Finestone (SBN 323709)
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
efinestone@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

**THE SCHALL LAW FIRM**
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Attorneys for Plaintiff*